# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | Case No. 4:11-CR-249 |
| | § | Judge Crone/Judge Mazzant |
| LEO ADAM APONTE | § § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant's Motion for Suppression of Evidence (Dkt. #18). Having considered the relevant pleadings and the arguments of the parties, the Court is of the opinion that Defendant's motion should be granted.

### BACKGROUND

On October 11, 2011, Deputy Ronnie Cates of the Collin County Sheriff's Department attempted to execute an arrest warrant for Morgan Malmberg at 1421 Francis Lane, Plano, Texas (Dkt. #18 at 2; Dkt. #20 at 1). When Deputy Cates approached the residence, he observed blankets covering the windows. Deputy Cates knocked on the door, which was answered by Mark Hodge. Deputy Cates indicated to Mr. Hodge that he was attempting to execute an arrest warrant for Mr. Malmberg, and asked if he was inside. Mr. Hodge indicated that Mr. Malmberg was not inside, and that he did not live there. At that time, Mr. Hodge told Deputy Cates that he would return with someone who was "in charge" of the residence. After a brief time, Jordan Sloan ("Jordan") came to the door and spoke with Deputy Cates. Jordan gave Deputy Cates permission to enter the residence to look for Mr. Malmberg, and indicated that he did not know Mr. Malmberg and he was not present at the residence.

Deputy Cates entered the residence and observed the living area and kitchen. In addition, Deputy Cates smelled marijuana. Jordan directed Deputy Cates to his bedroom, which Deputy Cates searched for Mr. Malmberg. At that time, he observed marijuana inside Jordan's room. Deputy Cates asked if there were any other people inside the home. Jordan first indicated that there was no one else inside the residence. However, upon entry to the next room, Deputy Cates observed Christopher Sloan and Rachel Lustig inside the room. He also observed marijuana inside Christopher Sloan's bedroom, and conducted a search for Mr. Malmberg. Deputy Cates viewed a third unoccupied bedroom. Deputy Cates then approached a closed, locked bedroom door. Jordan indicated that the owner of that bedroom was Leo Aponte, Defendant, and that he was not present. Jordan further indicated that he did not have permission to enter that bedroom, nor did he have a key to access that bedroom. Deputy Cates asked Jordan to get his keys and try them in the lock. One of the keys opened the door, and Deputy Cates entered Defendant's room. Inside he found a box of bullets, two firearms, and some quantity of marijuana.

Defendant moves the Court to suppress all physical, documentary, and other evidence seized in connection with the search of Defendant's bedroom (Dkt. #18 at 1). Defendant argues that the search of his bedroom was conducted without a warrant, and no exception to the warrant requirement existed to make the search reasonable. *Id*. The Government asserts that an officer acting pursuant to a valid arrest warrant may enter the residence where the suspect lives and where there is reason to believe the suspect is inside the dwelling (Dkt. #20 at 1). Thus, the Government contends that the evidence was seized during the attempted execution of a valid arrest warrant, and the evidence was located in the officer's plain view. *Id*.

On May 7, 2012, Defendant filed his Motion for Suppression of Evidence (Dkt. #18). The

Government filed its response on May 21, 2012 (Dkt. #20). On June 27, 2012, the Court held a hearing in which Kara Adams, Deputy Ronnie Cates, Jordan, and Rachel Lustig testified. In addition, the Government filed its Supplemental Response to Defendant's Motion to Suppress on June 28, 2012 (Dkt. #25).

*Kara Adams*

Kara Adams is a Clerk with Collin County Court at Law 3, and testified that her primary duties are to keep records, issue warrants and judgments, and other types of paperwork for the Court. Ms. Adams issued the warrant for Morgan Malmberg, and testified that 1421 Francis Lane, Plano, Texas, was the address listed by Mr. Malmberg on or about January 22, 2011, upon his arrest and booking in jail. Ms. Adams testified that it is the responsibility of a defendant, in this case Mr. Malmberg, to update his address in the system, otherwise the address provided at the time of booking will remain his address for warrant purposes. This warrant was issued on May 20, 2011, and is still an active warrant. The county court does not keep a record of how often law enforcement attempts to execute a warrant at a particular address, or if the address is no longer accurate.

*Deputy Ronnie Cates, Jr.*

Deputy Cates testified that he is a Deputy at the Collin County Sheriff's Office, and currently works on the fugitive squad. He has a total of twelve (12) years of law enforcement experience, and has served on the fugitive squad for about five (5) years. On October 11, 2011, Deputy Cates was on duty and attempted to execute an arrest warrant for Mr. Malmberg. The address listed on the warrant was 1421 Francis Lane, Plano, Texas. Deputy Cates testified that when he arrived at the residence, he observed blinds on one window and blankets hanging up to cover two other windows. Deputy Cates indicated that in his experience, this practice is consistent with houses in which a

3

fugitive is hiding. He knocked on the door, which was answered by a man with a beard after Deputy Cates requested he open the door. This man, now known to be Mr. Mark Hodge, indicated that he did not know Mr. Malmberg. In addition, Mr. Hodge informed Deputy Cates that he did not live there, and could not consent to a search of the residence. Deputy Cates testified that Mr. Hodge was shaking, trembling, and refused to make eye contact, which is consistent, in his experience, with a person that is hiding something. At that time, Mr. Hodge brought Jordan to the door to speak with Deputy Cates. Deputy Cates testified that after he asked for permission to search the residence, Jordan responded, saying, "Come in and look, I want to prove to you that Malmberg does not live here, and I don't know him." Deputy Cates testified that he also perceived Jordan to be nervous. At that time, Deputy Cates entered the residence in the living room. He testified that it was a dark, normal-looking house, but had a strong odor of marijuana. Deputy Cates observed the living area and kitchen before proceeding to Jordan's bedroom. Inside Jordan's bedroom was a small amount of marijuana. Deputy Cates informed Jordan that he was not a narcotics officer, and would not arrest him for a small amount of marijuana if that was all that was inside the house. At that time, Deputy Cates observed Jordan's room and conducted a search of only places where a person could hide. No one else was inside the room. Deputy Cates testified that he asked Jordan if there was anyone else in the house, and Jordan responded that no one else was there.

Deputy Cates then approached another bedroom, and Jordan told him that his brother might be inside. At this time, Deputy Cates felt that Jordan had been lying to him. Deputy Cates testified that he opened the door to the second bedroom, and a male and female were inside. The male was Jordan's brother, Christopher Sloan, and his friend, Rachel Lustig. Deputy Cates then approached a third bedroom that was mostly empty. Finally, Deputy Cates approached a fourth bedroom in the

4

hallway with the door closed and locked. Jordan told Deputy Cates that the bedroom belonged to Leo Aponte, Defendant, and that he did not have access to the room. Deputy Cates believed that Mr. Malmberg was behind that door. Deputy Cates asked Jordan for a key, and Jordan went and retrieved his keys, but told Deputy Cates that he did not believe that the key would unlock the door. However, one of the keys unlocked the door, and inside the room Deputy Cates observed two pistols, a box of bullets, and a bunch of marijuana.

Deputy Cates testified that there was no hesitation at all when Jordan consented to the search, and at no time did Jordan ask him to leave or to stop conducting the search of the residence. After the search was conducted, a different officer asked Jordan to sign a consent to search form. Deputy Cates did not find Mr. Malmberg at the residence, and every person at the residence stated that they did not know Mr. Malmberg.

*Jordan Michael Sloan*

Jordan testified that in October of 2011, he had lived at the residence at 1421 Francis Lane, Plano, Texas, for about seven (7) or eight (8) months. Jordan stated that Christopher Sloan and Leo Aponte also lived there. Jordan was listed as the tenant on the lease, and Defendant would pay the rent money to Jordan who would, in turn, pay the landlord. On October 11, 2011, Jordan was sleeping when Mr. Hodge told him that an officer was at the door. He quickly put on clothes and answered the door. Jordan testified that Deputy Cates showed him the warrant, and asked him if he knew Mr. Malmberg. Jordan stated that he did not know Mr. Malmberg. At that time, Deputy Cates told him that they could "do this the easy way, or the hard way," which Jordan stated he interpreted to mean he could allow Deputy Cates to search, or Deputy Cates would call other officers and "tear the house up." Jordan testified that he chose the easy way, and allowed Deputy Cates inside the

5

residence. Jordan testified that he was "somewhat nervous" when speaking with Deputy Cates.

Jordan stated that Deputy Cates looked inside the living room, kitchen, Jordan's bedroom, Christopher's bedroom, and an empty guest room. At this time, Deputy Cates asked him to open the closed, locked door. Jordan testified that he told Deputy Cates that the room belonged to Defendant, and that he did not have a key to the room. Jordan stated that Deputy Cates asked him to get his own keys. Jordan testified that he went through the keys to see if they worked, and after trying two different keys, one key opened the door. Jordan testified that this key was also his key to the front door, and that he was surprised that the key worked. Jordan stated that Defendant never gave him a key to the bedroom, and he had no authority or permission from Defendant to enter his room.

Jordan testified that each co-occupant bought his own lock for his bedroom door individually. He stated that Defendant always kept his door closed and locked when he was not there, and the last time he had been inside Defendant's room was approximately a week prior.

*Rachel Lustig*

Ms. Lustig testified that she arrived at the residence at 1421 Francis Lane, Plano, Texas, at approximately 7:00 a.m. that morning to visit her friend Christopher Sloan. Ms. Lustig stated that a police officer came into the home; however, until the door was opened during the search, she had no knowledge that he was in the house. Ms. Lustig testified that she knew Defendant through her friendship with Christopher, and that he was a private person. Ms. Lustig stated that she had only been inside his room once or twice while Defendant was at home, and that Defendant always locked his door when he left.

Ms. Lustig stated that she was present in the hallway when the officer asked Jordan to get his keys. Ms. Lustig stated that Jordan told Deputy Cates that the room belonged to Defendant, and that

6

he was at work at the time. After Jordan got his keys, the door was unlocked almost immediately.

**ANALYSIS**

At the June 27, 2012 hearing, Defendant argued that Deputy Cates performed a warrantless search of his room without any exception to the warrant requirement that would allow him to enter the room. Defendant contended that while Jordan may have had the authority to consent to the search of the common areas and his bedroom within the residence, he did not have authority to consent to the search of Defendant's locked bedroom. The Government responded that Deputy Cates behaved reasonably at all times. The Government argued that Deputy Cates had a valid arrest warrant, and received consent to search from a person who represented to him that he was the owner of the residence. Finally, the Government contended that Defendant had no reasonable expectation of privacy in his room if Defendant gave his co-occupant a key to his room.

*A. Does Defendant Have Standing to Seek Suppression?*

Fourth Amendment rights are personal in nature, and cannot be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). "In order to suppress illegally seized evidence, a defendant must establish standing to challenge the search and may do so by demonstrating that [he] has a legitimate expectation of privacy in the area searched." *United States v. Corral*, 339 F. Supp. 2d 781, 788 (W.D. Tex. 2004) (citing *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991)). Whether Defendant has a legitimate expectation of privacy can be determined by several factors, including

> whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.

*Ibarra*, 948 F.2d at 906 (citation omitted).

At the time of the search, Defendant lived on the premises, paid rent to Jordan to occupy his room, and Defendant was residing in the room searched by the Deputy Cates. Although no testimony was heard on the ownership of the items seized, they were seized from the room in which Defendant resided. Further, the testimony clearly established that it was Defendant's practice to exclude others from his room. Defendant locked his room each time he left the residence, and took normal precautions to maintain his privacy in his bedroom. Therefore, it appears that Defendant had the right to exclude others from the bedroom, and the Court finds that he had a reasonable expectation of privacy in the room and the closet that was searched by Deputy Cates.

*B. Was the Search Proper?*

The Fourth Amendment ensures that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A person has a reasonable expectation of privacy in the sanctuary of his home and is entitled to Fourth Amendment protection. *Katz v. United States*, 389 U.S. 347 (1967). The warrantless search of an area in which the Defendant has a privacy interest is *per se* unreasonable, unless the Government can show that an exception applies. *Id*. at 357. Fourth Amendment jurisprudence recognizes several warrant exceptions. "Valid consent is one of the exceptions to the warrant requirement; therefore, a warrantless search violates no Fourth Amendment right or protection if conducted pursuant to valid consent." *Corral*, 339 F. Supp. 2d at 789 (citing *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)). "When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving

that the third party had either actual or apparent authority to consent." *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997), *overruled on other grounds by United States v. O'Brien*, 130 S.Ct. 2169 (2010). In order to show that a third party had actual authority to consent, the government must demonstrate "mutual use of the property by persons generally having joint access or control for most purposes." *Id*. (citing *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). "To establish that a third party had apparent authority to consent, however, the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent." *Id*. (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). "The validity of a search grounded in third-party consent requires an intensely fact-specific inquiry, and that slight variations in the facts may cause the results to vary." *United States v. Shelton*, 337 F.3d 529, 535 (5th Cir. 2003).

*1. Actual Authority*

The question before the Court is whether Jordan had authority, either actual or apparent, to consent to a search of Defendant's closed, locked bedroom within the residence. Actual authority is demonstrated by "mutual use of the property by those generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk" that a search of a common area might be permitted. *Matlock*, 415 U.S. at 171 n.7.

Based on the evidence provided at the hearing on this matter, the Court cannot conclude that Jordan possessed actual authority to consent to the warrantless search of Defendant's bedroom. While it is clear that Jordan had actual authority to consent to a search of the areas used in common by the three co-occupants, such as the kitchen and living room, there is no indication that Jordan had mutual access or control over Defendant's bedroom. In fact, to the contrary, the evidence is clear

9

that Defendant excluded all others from his bedroom when he was not present. He consistently closed his door, even at times when he was at the residence. Further, he purchased his own lock, independent of his co-occupants, and installed it on his bedroom door. Finally, the evidence indicates that he consistently closed and locked his bedroom door each time he left the residence. There is simply no indication that Jordan had any type of mutual use of the property, and it would not be reasonable to conclude that Defendant "assumed the risk" that one of his co-inhabitants might permit a search to be conducted.

Therefore, the Court finds that Jordan did not have actual authority to consent to a search of Defendant's bedroom.

*2. Apparent Authority*

Without actual authority, warrantless searches can be upheld if a third party conveys apparent authority to consent to a search. *Rodriguez*, 497 U.S. at 177. "To establish that a third party had apparent authority to consent... the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent." *Gonzales*, 121 F.3d at 938. The "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 189 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). Fifth Circuit case law implies that the apparent authority doctrine only insulates mistakes of fact. *Corral*, 339 F. Supp. 2d at 795. That is, an officer faced with an ambiguous or unclear situation must make further inquiries before engaging in warrantless searches. *Id*. at 794 (discussing *Matlock*, 415 U.S. at 171; *Rodriguez*, 497 U.S. at 189).

It does not appear that Deputy Cates relied on any erroneous piece of information that, if true,

would establish the proper authority to consent. When asking for permission to search the residence, he spoke with Mr. Hodge, an individual who told Deputy Cates that he did not live at the residence. Further, Deputy Cates was told by Mr. Hodge that Jordan was "in charge" of the house. However, Deputy Cates had no information regarding whether Jordan owned the house, leased the house, or what Jordan's ownership status was. From the testimony given at the hearing, it does not appear that Deputy Cates made any inquiry aimed at obtaining further information. Specifically relating to Defendant's locked bedroom, Jordan made Deputy Cates aware that the bedroom belonged to Defendant, that he had no right to access the bedroom, and that he did not have a key to the bedroom. Deputy Cates was given no erroneous information that would establish the proper authority to consent.

The Government argues that Defendant gave Jordan a key to his bedroom, and, in doing this, gave up his expectation of privacy in his bedroom and allowed Jordan to consent to the search. However, the evidence given at the hearing was that the key that unlocked Defendant's bedroom door was, in fact, Jordan's personal key to the front door. Jordan testified that Defendant had never given him a key, and the poor quality of the lock allowed the front door key to open the lock. In addition, Deputy Cates also testified that Jordan told him he did not have a key to Defendant's bedroom; however, he stated that he did not believe him. Simply because Deputy Cates did not believe Jordan's statement that he did not have a key does not establish apparent authority to consent to a search. "If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful *without further inquiry*.'" *United States v. Whitfield*, 939 F.2d 1071, 1074 (D.C. Cir. 1991) (citations omitted) (emphasis in original). Deputy Cates obtained only

11

minimal information regarding Jordan's ownership or tenancy at the premises, and Defendant's status regarding the property. However, the minimal information Deputy Cates was given made it clear that Defendant's room was not subject to mutual use by the person giving consent. Further, the Supreme Court has implicitly held that possession of a key is not sufficient to give actual authority to search, without deciding on the basis of the facts before them whether the circumstances allowed for apparent authority to search. *See, e.g., Rodriguez*, 497 U.S. at 180.

Based on the facts in the present case, the Court finds that Jordan did not have apparent authority to consent to the search. Jordan clearly told Deputy Cates that the bedroom belonged to Defendant, and that he did not have access or permission to go in the bedroom. Deputy Cates declined to inquire further, and simply requested that Jordan get his keys. Although one of the keys happened to open the door to Defendant's bedroom, the Court finds that this fact alone does not establish apparent authority.

*3. Voluntary Consent*

Defendant also briefly asserts that the consent given by Jordan was not voluntary under the circumstances. "Voluntary consent to a search is an exception to the general prohibition on warrantless searches." *United States v. Jacobs*, 125 Fed. App'x 518, 523 (5th Cir. 2005) (*citing United States v. Jenkins*, 46 F.3d 447, 454 (5th Cir. 1995)). The Court considers six factors in determining the voluntariness of consent, which are:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Id*. (citing *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997)). The voluntariness of the

consent given is determined by a totality of the circumstances, and no one factor is dispositive. *Id*.

The Court finds that the consent given by Jordan Sloan to search the portions of the residence where the residents enjoyed joint access and mutual use of the property was voluntary. Jordan was not in custody at the time that Deputy Cates requested to search the property. He had complete freedom of movement, and Deputy Cates testified that had Jordan refused to consent, he would have left the premises. Jordan testified that he was "somewhat nervous" in the presence of Deputy Cates, and that Deputy Cates told him that they could "do things the easy way or the hard way." While this statement was clearly made to induce compliance with Deputy Cates' request to search the premises, the Court does not believe that Jordan was coerced into allowing the search to proceed. Further, Jordan fully cooperated with the requests made by Deputy Cates. At the hearing, Deputy Cates testified that he did not inform Jordan of his right to refuse consent to search; however, this does not provide any indication that his consent was involuntary. Although there is no evidence regarding Jordan's education and intelligence, it appears that he had no mental deficiencies or other mental conditions that would render him unable to give informed consent. Further, it is unclear whether Jordan believed incriminating evidence would be found inside or not. Therefore, given the totality of the circumstances, the Court finds that Jordan's consent to search his bedroom and the portions of the residence to which all residents had joint access was voluntary.

*4. Arrest Warrant*

Defendant finally argues that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). However, the Court finds this argument unpersuasive. Although the warrant itself indicated that Mr. Malmberg's address

13

was 1421 Francis Lane, Plano, Texas, every person at the residence indicated that Mr. Malmberg did not live there, and that they did not know who he was. Deputy Cates himself testified that had Jordan not given consent to search the residence, he would have left the premises. Evidence that two windows were covered by blankets, and Mr. Hodge and Jordan were nervous when speaking with Deputy Cates, is insufficient to establish a "reason to believe the suspect is within" in order to justify the search of the residence on this basis.

## RECOMMENDATION

Based on the foregoing, the Court recommends that Defendant's Motion for Suppression of Evidence (Dkt. #18) be **GRANTED**.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 5th day of July, 2012.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE